AO 91 (Rev. 11/11) Criminal Complaint                                    AUSA Kirsten Moran (312) 722-2291

**FILED**
8/1/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CHRISTOPHER YATES

CASE NUMBER:  1:24-cr-00357

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about July 5, 2024 to on or about July 30, 2024, at Oak Lawn, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1958(a) | murder for hire and conspiracy to commit murder for hire |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Ruben Garcia*
RUBEN GARCIA
Special Agent, Homeland Security Investigations (HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: July 31, 2024

*Heather K. McShain*
*Judge's signature*

City and state: Chicago, Illinois

HEATHER K. MCSHAIN
U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

### AFFIDAVIT

I, RUBEN GARCIA, being duly sworn, state as follows:

1.     I am a Special Agent with the Homeland Security Investigations (HSI) and have been so employed since March of 2023.  Prior to being employed by Homeland Security Investigations I was employed as Police Officer for the City of Madison (Wisconsin) for 5.5 years. My current responsibilities include narcotic investigations, the investigation of violent crimes, including, among others, kidnaping, and the apprehension of violent fugitives.

2.     This affidavit is submitted in support of a criminal complaint alleging that Christopher YATES has violated Title 18, United States Code, Section 1958(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging YATES with murder for hire and conspiracy to commit murder for hire, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     The facts in this affidavit come from my personal observations and knowledge, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient

probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## I.    FACTS ESTABLISHING PROBABLE CAUSE

4.    HSI has been investigating a conspiracy and solicitation for murder for hire by Christopher YATES, who is believed to be conspiring and soliciting to hire two individuals to commit two murders in the Chicago area. As described further below:

a.    On or about July 5, 2024, an HSI source of information ("SOI-1")[1], contacted HSI special agents notifying special agents that YATES was contacting SOI-1 via in-person meets, phone calls, and text messages to potentially solicit a murder for hire.

b.    On or about July 8, 2024, YATES was in communication with SOI-1 via phone calls and text messages to confirm an in-person meet with SOI-1 and a federal cooperating defendant ("CD-1")[2],  to take place on July 9, 2024 in the Oak Lawn, Illinois area.

---

[1] SOI-1 is cooperating with the U.S. government upon SOI-1's own free will and in the hopes of third-party cooperation credit for CD-1, with whom he/she is close friends.  SOI-1's cooperation does not stem from any charges filed against SOI-1. SOI-1 has cooperated on previous instances with the U.S. government, starting in approximately February of 2024. SOI-1 has been paid $2,500 for his/her cooperation on a previous investigation. SOI-1 has prior convictions for manufacturing/dealing controlled substances, dangerous drugs, retail theft, aggravated unlawful restraint, and residential burglary.

[2] CD-1 is cooperating with the U.S. government in hopes of receiving sentencing cooperation credit for his convictions stemming from a case charged in the Southern District of Florida. In December 2023, CD-1 pled guilty to two counts of violating 18 U.S.C. Section 2423(b), travel with intent to engage in illicit sexual conduct with a minor.

c.     On or about July 9, 2024, YATES communicated with SOI-1 via phone calls and text messages, and met with SOI-1 and CD-1 in Oak Lawn, Illinois.  During the meeting between SOI-1, CD-1, and YATES, YATES provided CD-1 with a firearm, $250 in U.S. currency, and solicited CD-1 to murder two subjects (whom YATES did not fully identify) who were to be witnesses in a trial, where the defendant in that trial was charged with murder.

d.     Between on or about July 9, 2024 and July 28, 2024, YATES was in communication with SOI-1 via phone calls, text messages, and two in-person encounters, wherein YATES related to SOI-1 that he was gathering identifiable information regarding the two intended subjects to be murdered.

e.     On or about July 30, 2024, YATES communicated with SOI-1 via phone calls and text messages, to set up a  meeting with SOI-1 and CD-1 in Oak Lawn, Illinois. During the meeting between SOI-1, CD-1, and YATES, YATES provided identifying information about one of the intended targets to be murdered (Individual A) and provided logistical information on how CD-1 and SOI-1 can arrange an in-person meeting with Individual A.  YATES further explained that he needed more time to identify the other intended target to be murdered (Individual C).

**A.     July 5, 2024: SOI-1 Notifies HSI Agents of a Potential Solicitation for Murder Plot by YATES**

5.     On or about July 5, 2024, YATES, utilizing the phone number 708-XXX-9234 had a phone conversation with SOI-1.  SOI-1 related to agents that YATES wanted to meet with "Big Bro", who SOI-1 understood to be CD-1.  Based on comments that YATES made to SOI-1 earlier in the year about assisting a mutual

acquaintance, Individual D, SOI-1 believed YATES wished to meet with CD-1 to potentially solicit CD-1 to engage in a murder for hire. Individual D was (and remains) in pretrial detention at Cook County Jail awaiting murder and attempted murder charges.

6.     SOI-1 and YATES know each other from childhood and had a pre-existing long-term friendship. SOI-1 has previously met YATES in person and communicated with him over the phone. According to SOI-1 and CD-1, YATES' outreach regarding a potential murder for hire stemmed from YATES' familiarity with CD-1's father due to CD-1's father's perceived involvement in large scale narcotics trafficking and various other criminal activity.

**B.     July 5 – July 8, 2024: YATES and SOI-1 Communicate and Arrange for an In-person Meeting to Occur on July 9, 2024**

7.     Between on or about July 5, 2024 through July 8, 2024, SOI-1 and YATES engaged in phone conversations to confirm a meeting between YATES, SOI-1, and CD-1 to occur in Oak Lawn, Illinois on July 9, 2024, at approximately 6:00 p.m.[3]  The telephone conversations between SOI-1 and YATES were not recorded. Based on my training and experience, the use of a cellular telephone is a facility of interstate commerce.

**C.     July 9, 2024: YATES Solicits SOI-1 and CD-1 to Murder Two Subjects and Provides Them With a Firearm and $250 in U.S. Currency**

8.     On or about July 9, 2024, YATES had a series of texts and telephone calls with SOI-1 to follow up regarding the in-person meeting to occur in the Oak

---

[3] Unless otherwise indicated, all times in this Affidavit are in the Central Time Zone.

Lawn, Illinois area. The calls were not recorded, but the text messages have been preserved by law enforcement.

9.     At approximately 5:46 p.m., SOI-1 called YATES and advised YATES to meet at a business located at 111th and Cicero Ave.  Other law enforcement agents were present during the call and could hear both sides of the conversation.

10.     At approximately 6:03 p.m., SOI-1 called YATES and YATES advised he would be at the meet location before 7:00 p.m. Law enforcement agents were present during the call and could hear both sides of the conversation.

11.     At approximately 7:01 p.m., SOI-1 called YATES, and YATES advised that he was enroute to the meet location from 31st Street and the Dan Ryan in Chicago, Illinois.  Although YATES previously related to SOI-1 that he did not want to bring the "woowop"[4] with him to the in-person meet because his vehicle's license plates were suspended, YATES advised SOI-1 on this call that he was bringing the "woowop."  Law enforcement agents were present during the call and could hear both sides of the conversation.

12.     Prior to the meeting, agents searched SOI-1, CD-1, and SOI-1's vehicle for the presence of contraband and firearms, with negative results. Law enforcement also searched for the presence of large amounts of U.S. currency, with negative results for SOI-1 and SOI-1's vehicle. With respect to U.S. currency for CD-1, law enforcement retrieved CD-1's wallet, which contained U.S. currency, and placed it in a sealed evidence bag, which remained in law enforcement presence for the duration

---

[4] According to SOI-1, "woowop" is YATES's term for a firearm.

of the operation. Law enforcement outfitted SOI-1 and CD-1 with concealed audio recording equipment, and outfitted SOI-1's vehicle with concealed audio and video recording equipment, and observed SOI-1 and CD-1, inside of SOI-1's vehicle, travel to the meet location under constant surveillance.

13.     According to SOI-1 and the audio recording, at approximately 8:05 p.m., SOI-1 received an incoming call from YATES. In summary, YATES advised he was in the area but could not locate the meet location.  SOI-1 guided him to the meet location's parking lot.  YATES advised that he was in a gray car, later identified as a Ford Fusion, that was not registered to YATES.  SOI-1 proceeded to guide YATES to park the Ford Fusion next to SOI-1's vehicle.

14.     According to the audio recording, at approximately 8:08 p.m., SOI-1 called YATES and told YATES to enter SOI-1's vehicle through the rear driver's side door.  YATES can be heard saying through SOI-1's speakerphone, "Yeah, I had to get it."

15.     Law enforcement officials continued conducting surveillance and observed that at approximately 8:07 p.m., a gray Ford Fusion parked next to the driver's side of SOI-1's vehicle.  A male black with braids, matching YATES's physical identifiers based on YATES' driver's license image, exited the front passenger seat of the Ford Fusion and entered SOI-1's vehicle. Following the meeting, SOI-1 and CD-1 also confirmed that the individual they met was YATES.

16.     At approximately 8:08 p.m., YATES entered SOI-1's vehicle through the rear driver's side door.

17.    According to the audio recording, in summary, during the meeting, YATES requested assistance from CD-1 and SOI-1 in murdering two unidentified individuals, Individual A and Individual C, who were witnesses in an upcoming murder trial. During the meeting, YATES provided CD-1 and SOI-1 with a firearm and $250, with a promise to provide more money in the future and additional information about the target victims.  The excerpts below are summaries, and not verbatim recitations, of the encounter. At certain times, I include my interpretation of the events after the statements or in brackets.[5]

a.    According to the audio recording, at approximately 8:10 p.m., SOI-1 instructed YATES to explain to CD-1 what YATES has previously told SOI-1.  YATES stated that he would have "been got it out the way" but YATES knew "they" [referring to the police] will come to him (YATES) anyway. Based on my understanding of the context of the conversation, I understood YATES to be alluding to murdering two witnesses on his own, but being incapable because he would become the primary suspect.

---

[5] The conversation referenced below has been recorded and preserved. This affidavit does not notate every communication between YATES, CD-1, and SOI-1. The following is a summary of the communication and may not include the entire communication. Where recorded conversations are discussed in this affidavit, the language that is quoted from the recorded conversations is based upon a preliminary review of the recorded conversations and not on final transcripts of the recorded conversations. Summaries and excerpts do not include all statements or topics covered during the course of the recorded conversations. At various points in the affidavit, I have included, either in brackets or summary form, my interpretation of words and phrases used in recorded conversations. My interpretations are based on the contents and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

b. According to the audio recording, YATES stated to CD-1 and SOI-1, "the thing about it is, bro, you know what I'm saying, it's his bitch she's trying to (unintelligible), no good, the female of the guy who survived, who woke up out the coma, and gave 'his bitch' name up and that's how they got up on cuzzo. So she end up getting caught six months before they caught cuz…no they caught cuzzo first but they caught her six months later." Based on my conversations with CD-1 and SOI-1 and my understanding of the context in the conversation, I believe YATES' reference to "his bitch" refers to Individual D's girlfriend, Individual A, and discusses law enforcement's identification of Individual A as a witness to the underlying murder. Throughout the course of the conversation, and based on my conversations with CD-1 and SOI-1, I understand YATES to be referring to Individual D when he uses the terms "cuzzo" and "Little G."

18. Individual D is currently in custody at Cook County Jail with pending murder and attempted murder charges in 20CR1180901. According to the Cook County Assistant State's Attorney (CCASA), the underlying murder occurred when Individual D and Individual D's girlfriend, Individual A, approached two individuals who were seated in a vehicle, a female (Individual B) and a male (Individual C). According to the CCASA, Individual D fired into the vehicle, killing Individual B, who was the purported intended target of the murder, and injuring Individual C. The trial is currently set for October 2024.

a. According to the audio recording, YATES continued to explain the details of the murder Individual D is charged with and Individual A's role to SOI-1

and CD-1, stating that, "there is no physical evidence but they [the police] have cameras but the cameras are too far down, they can see the action but they can't say it's him, they need a motherfucker to point him out. So his bitch turned state." Based on my training and experience, "turning state" is a slang phrase for a witness designated to testify as a witness for the prosecution.

b.     According to the audio recording, CD-1 asked YATES, "so she don't want to point him out?"  YATES replied, "no, 'Buddy' [referring to Individual C] talked [to law enforcement], but if we knock him off the board they gonna go get her (unintelligible) state."

c.     According to the audio recording, CD-1 asked YATES, "Little G [Individual D] just wants the guy [Individual C] gone, he don't really want ole girl [Individual A] gone?"  YATES responded, "That's what he [Individual D] thinks but I want them both the fuck off the board.  It's a waste of time. Like why play the game? If you (unintelligible) doing what the fuck you doing, like real shit, I want them both off the board . . . both of them got to fucking go, that way (unintelligible) case." Based on my training and experience, "off the board" is a slang phrase for murdering an individual.

d.     According to the audio recording, at approximately 8:13 p.m., YATES stated that he will be working on getting SOI-1 and CD-1 a picture of Individual C[6] and "Silvia" (Individual A), and should be able to provide it to CD-1 and SOI-1 by July

---

[6] YATES did not know Individual C's name and stated he would provide it by Friday.

12, 2024. YATES stated he would like this to happen as soon as possible, as Little G's [Individual D's] trial is in August.

e.     According to the audio recording, at approximately 8:14 p.m., YATES stated that he wanted separate firearms used on Individual A and Individual C due to ballistic tracing. CD-1 asked YATES which one YATES wants to go first, YATES responded by stating, "Knock buddy's [Individual C] ass off first cause he the key witness. . . (unintelligible) came to [woke up from a comatose state] bro, and they was like you know who shot you, who shot you and shit and he like, 'No. No, but I know the female that was with him.' And he gave up her name and they [police] went to her crib and her mama then gave up his info and they went to his house and snatch his [Individual D] ass out of bed."

f.     According to the audio recording, YATES explained that Little G [Individual D] was talking over recorded jail calls too much and it is getting close to Little G's [Individual D's] trial and Little G [Individual D] told YATES, "I need his [Individual C] ass gone."

g.     According to the audio recording, CD-1 asked YATES, "You said you want to use different toys [firearms] right?" YATES responded, "Yeah, two toys bro, the one I got now right now, brand new bro (unintelligible) made fresh, ain't been used only for the . . . for the new years bro." According to the video recording and SOI-1 and CD-1, YATES then handed CD-1 a firearm and loose ammunition stating, "That's red tips, the ones that go through body armor, I got a fresh box of them." The firearm and ammunition provided by YATES to CD-1 are pictured below:

 

h.     According to the audio recording, at approximately 8:16 p.m., YATES explained how the murder of Individual A could occur, stating, "For her [Individual A], she was fucking with one, I'm trying to get up with the a nigga that was part of our circle, and our circle start fucking with him because he was rotating with us and Little G [Individual D] before this shit happened then when blood got booked he started fucking on the bitch so once I find him, I know, I can find the bitch [Individual A], but I know I can knocking him as a lost casualty and make it look like it was some street shit, you know what I'm saying? So we gettin them both." CD-1 poses a question and YATES then states, "I don't give a fuck who she with, they gotta get caught too (unintelligible)." I believe that when YATES states, "they gotta get caught too", he is stating that whoever Individual A is with also has to be killed, and it can look like a casualty due to the streets commonly having unintended victims murdered.

i.     According to the audio recording, at approximately 8:18 p.m., CD-1 asked YATES about how YATES wants Individual C to be murdered, stating, "With

11

the first guy [Individual C], how you want to make that look?" YATES responded, "(unintelligible) End of the day bro, we down in the streets, he [Individual C] get killed however he get caught (unintelligible). As long as he gets his ass scratched off the map."

j.    According to the audio recording, YATES then went on to detail some facts about what happened to Individual C during the underlying murder allegedly committed by Individual D. SOI-1 told CD-1 that last night (July 8, 2024) YATES told SOI-1, "something about face shots." YATES responded, "Yeah, hell yeah, he [Individual C] took those in the body and the man [Individual C] survived, what saved his life, brother man had a seizure, on baby that's what saved his life, the man had a seizure bro, and they took him into a coma and that's what made him survive."

k.    According to the audio recording, CD-1 asked YATES further details about the underlying murder, "So when Little G [Individual D] hit him, he hit him (unintelligible)?" YATES replied, "Man he hit his [Individual C] ass with a nine bro, (unintelligible) 45, the compact with the trigger on the back, hit his ass with that bitch bro six times, the man [Individual C] survived. Shorty [Individual B] got hit with the other six but she died instantly, off the burst because she was in the driver's seat. He [Individual D] got to squeezing on Buddy's ass he thought he slumpt[7] him when he leant over but he snapped into a seizure, that's what saved him."

---

[7] Based on my training and experience, the term "slumpt" is a common slang term for killing an individual.

l. According to the audio recording, CD-1 asked YATES, "So you want this all up close?" YATES replied, "On life bro."

m. According to the audio recording, YATES went on to explain how he was planning to pay CD-1 and SOI-1, stating, "Bro whatever it costs, I know I owe a tip (unintelligible), right now I ain't gunna stunt, all I got right now is $250, whatever you charge, I'm working on that."

n. According to the audio recording, CD-1 asks YATES for the names [referring to Individual A and Individual C]. YATES replied, "I finna have that (unintelligible) I'm gonna have the name of each one and I'm looking for the address."

o. According to the audio recording, at approximately 8:22 p.m., YATES handed CD-1 $250 US currency. CD-1 told YATES, "I'm going to holler at my old man for you."

p. According to the audio recording, YATES explained to CD-1 and SOI-1 that he receives ghost guns[8] from Arizona, but obtained the firearm provided to CD-1 from his little brother. YATES proceeded to explain he can obtain various guns in four to five days and people will drive the firearms to YATES. YATES proceeded to explain he can obtain silencers for $20.

q. According to the audio recording, at approximately 8:26 p.m., YATES continued to provide details about the underlying state murder case stating, "He (unintelligible) his bitch off but not knowing how my cousin going, and he cuz just so

---

[8] Based on my training and experience, a ghost gun is a "do it yourself" homemade firearm that is difficult to trace because they usually have no identifiable serial number.

happen to get up with them in traffic and saw them and he slumpt they ass, well slumpt her but thought he slumpt Buddy." CD-1 asked YATES, "So it was two people, one person got killed and the other one woke up." YATES replied, "The nigga and the bitch, the nigga woke up out the coma, the bitch got killed. They was sitting in the car just like this. Bro rolled up, pulled right over, bailed out that bitch." YATES proceeded to mimic gunshot noises then stated, "He thought he slumpt they ass, but he slumpt her, she died instantly but buddy [Individual C] ass survive. He was in coma for like two months." Based on my understanding of the events in the underlying murder allegedly committed by Individual D, I believe that YATES is recounting facts regarding the same murder.

r.     According to the audio recording, CD-1 told YATES to have a good picture of the victim targets. YATES responded, "Nigga it's going to be like it's a selfie, (unintelligible) names, address, face, picture."

s.     According to the audio recording, CD-1 asked YATES if Little G [Individual D] knows everything. YATES responded, "Little G [Individual D] know everything what's going on."

t.     According to the audio recording, YATES then exited SOI-1's vehicle continued to engage in dialogue with CD-1 and SOI-1, then entered the gray Ford Fusion and departed the area.

**D.     July 18, 2024: YATES Tentatively Confirms a Meeting for July 19 to Provide the Victim Details to SOI-1 and CD-1 for the Murder for Hire**

19.     Between July 9, 2024 and July 18, 2024, SOI-1, CD-1 and YATES corresponded about meeting up so that YATES could provide SOI-1 and CD-1 with

information about the victim targets, Individual A and Individual C. Although initially YATES indicated they would meet July 12, 2024 to provide the information, YATES later confirmed that he was still gathering the data.

20.     On July 18, 2024, YATES told SOI-1 in summary, that he was still working on getting together the information about the victim targets but that he would try to meet the next day (July 19) after 4 p.m., but that he would be leaving thereafter on a long road trip. That meeting did not occur.

**E.     July 22, 2024: SOI-1 and YATES Discuss the Identity of Individual A**

21.     According to SOI-1, on July 22, 2024, SOI-1 arrived at a medical facility with the intention to visit with SOI's aunt, who is also YATES's mother.  As SOI-1 was visiting with SOI-1's aunt, YATES called SOI-1's aunt, and SOI-1's aunt notified YATES that SOI-1 was present.  This meeting was not audio recorded, video recorded, or monitored by agents. The following is a nonverbatim summary of conversations and events, according to SOI-1:

22.     According to SOI-1, SOI-1's aunt had the phone on speakerphone to which YATES responded, "tell him/her (SOI-1) to stay up there".

23.     At approximately 5:01 p.m., SOI-1 received a Facetime call from YATES. According to SOI-1, YATES requested that SOI-1 stay at in the medical facility's room with SOI-1's aunt.  Shortly thereafter, YATES and a female arrived at SOI-1's aunt's room.

24.     According to SOI-1, YATES gestured to SOI-1 to move to the hallway. SOI-1 and YATES moved to the hallway by themselves.  According to SOI-1, YATES

explained to SOI-1 that he (YATES) was still working on retrieving the identifiable information of the intended targets of the murder.

25.     According to SOI-1, SOI-1 and YATES exited the hospital to smoke cigarettes together alone.  According to SOI-1, YATES began to explain to SOI-1 that Individual A's name was "Silvia".  According to SOI-1, YATES called a female that YATES referred to as "Best Friend" or "BF", herein "BF", that lived in Arizona to assist with further identifying Individual A.  According to SOI-1, YATES trusted BF to have knowledge of Individual A's identity due to BF booking airline flights for BF, Individual A, Individual D, and YATES for a past trip they took together.

26.     According to SOI-1, SOI-1 and YATES exited the hospital together and walked to SOI-1's vehicle.  YATES entered SOI-1's vehicle and requested SOI-1 drive YATES to YATES's vehicle which was parked in a different parking lot of the medical facility.  According to SOI-1, during the ride to YATES's vehicle, YATES advised SOI-1 to communicate with him (YATES) via WhatsApp only due to WhatsApp not being traceable. I understand this to mean the police cannot trace WhatsApp messages or calls.

**F.     July 28, 2024: SOI-1 and YATES Discuss the Identity of Individual A**

27.     According to SOI-1, on the evening of July 28, 2024, SOI-1 attended a family barbeque in the 1800 block of South Drake in Chicago, Illinois.  According to SOI-1, approximately twenty minutes after SOI-1's arrival, YATES arrived at the same family barbeque.  This meeting was not audio recorded, video recorded, or

monitored by agents. The following is a nonverbatim summary of conversations and events, provided by SOI-1:

28.     According to SOI-1, YATES engaged SOI-1 and began to explain that YATES spoke to Individual D over the last four days (not including July 28, 2024) via Cook County, Illinois jail calls.  According to SOI-1, YATES related that Individual D instructed YATES to stop using the communication applications Telegram, WhatsApp, or texting.  According to SOI-1, Individual D further instructed SOI-1 to only communicate via in-person meets.

29.     According to SOI-1, YATES advised that Individual D had instructed YATES to not "hit" them at the same time.  Law enforcement understood SOI-1's term "hit" to mean murder a target, and that YATES was referring to not murdering Individual A and Individual C at the same time.  According to SOI-1, YATES further advised that the murder of Individual A needed to look like a robbery, and whoever Individual A is with also needs to be murdered.   According to SOI-1, YATES related to SOI-1 that when the murder takes place, he (YATES) knows that the police are going to select him (YATES) as a primary suspect first.

30.     According to SOI-1, YATES related that he had Individual A's Facebook profile and knows Individual A as "Silvia XXXXXX."  According to SOI-1, YATES proceeded to show SOI-1 his (YATES') phone, which had the Facebook profile of "███████  living in Chicago, Illinois on the screen.  SOI-1 took a picture of the phone which had the Facebook profile of "███████ with YATES's left hand in the image holding his phone with the Facebook profile "███████ on the screen.

Investigators for the underlying state murder and attempted murder, for which Individual D has been charged, obtained a search warrant for the Facebook profile "███████ The search warrant returned a Yahoo email address with Individual A's name as part of the email address. According to state law enforcement, Individual A is the name of one of the witnesses in Individual D's case.

31. According to SOI-1, YATES related that Individual A needed to be murdered first. According to SOI-1, YATES advised SOI-1 that he would reiterate SOI-1 and YATES's conversation to CD-1, provide the identity of Individual C, and bring a box of ammunition on to an in-person meet to occur on July 30, 2024.

**G.      July 30, 2024: YATES Solicits SOI-1 and CD-1 to Murder Two Subjects and Provides the Identity of One Intended Target**

32. On or about July 30, 2024 YATES had a series of texts and telephone calls with SOI-1 to follow up regarding the in-person meeting to occur in the Oak Lawn, Illinois area. According to SOI-1, SOI-1 received an incoming call/Facetime from YATES at 11:44 a.m., wherein YATES confirmed the in-person meeting with CD-1 and SOI-1 to occur in Oak Lawn, Illinois at 8:00 p.m.

33. At approximately 7:46 p.m. on July 30, 2024, SOI-1 called YATES.  In summary, YATES related that he had just gotten off of work and would be heading to the meeting as soon as he can.  The call was recorded by agents.

34. At approximately 8:43 p.m., SOI-1 called YATES.  YATES related that he needed gas money to be able to attend the meeting.  The call was recorded by agents.

35. At approximately 9:00 p.m., according to SOI-1, YATES called SOI-1 discussing money for gas.  The call was not recorded.

36.     Prior to the meeting, agents searched SOI-1, CD-1, and SOI-1's vehicle for the presence of contraband and firearms, with negative results. Law enforcement also searched CD-1, SOI-1, and SOI-1's vehicle for the presence of large amounts of U.S. currency, with negative results. Law enforcement outfitted SOI-1 with concealed audio recording equipment, and outfitted SOI-1's vehicle with concealed audio and video recording equipment, and observed SOI-1 and CD-1, inside of SOI-1's vehicle, travel to the meet location under constant surveillance.

37.     At approximately 9:46 p.m., SOI-1 received a call from YATES  In summary, YATES advised SOI-1 that he was on the way and SOI-1 told him that he was at the meeting location.  The call was recorded.

38.     At approximately 10:00 p.m., SOI-1 called YATES.  In summary, SOI-1 asked if YATES could see his vehicle at the meeting location. YATES responded that he was at 103rd Street and was still on the way.

39.     At approximately 10:03 p.m., law enforcement agents observed a black Dodge Charger, registered to Christopher YATES, enter the parking lot of the meet location.

40.     At approximately 10:04 p.m., law enforcement agents observed the black Dodge Charger park next to SOI-1's vehicle.  Agents then observed a subject matching YATES's driver's license physical identifiers exit the black Dodge Charger and enter SOI-1's vehicle.

41.     According to the audio recording, in summary, during the meeting, YATES requested assistance from CD-1 and SOI-1 in murdering one identified

19

individual, Individual A, and one unidentified individual, Individual C, who were witnesses in an upcoming murder trial. During the meeting, YATES presented his phone to show CD-1 the Facebook profile of Individual A and instructions on how to arrange an in-person meet with Individual A. The excerpts below are summaries, and not verbatim recitations, of the encounter. At certain times, I include my interpretation of the events after the statements or in brackets.

      a.    According to the recording and CD-1, YATES showed CD-1 the Facebook profile of Individual A. YATES proceeded to give CD-1 the real name of the individual showed to CD-1 via Facebook, Individual A.

      b.    According to the recording, CD-1 asked YATES about the firearms to be used in the murders. YATES, regarding Individual C, stated, "He didn't take no face shots… if you hit him in the head, the brain goin to die." YATES explained that Individual C needed to be shot in the head because the last time Individual C was shot, he was shot in the body and did not die. YATES proceeded to explain that in relation to the murder of Individual C, YATES was going to try to get another revolver, in an effort to retain the bullet casing.

      c.    According to the recording, YATES explained that Individual D was more concerned about killing Individual C than Individual A.

d. According to the recording, YATES explained, "Little G [Individual D] was talking about leavin the bitch alone… I'm not going for that. She turned state on him. He knows this."

e. According to the recording, YATES explained that when YATES talks to Individual D, Individual D asks YATES why he hasn't seen anything on the news yet. Agents understand this to mean that Individual D is asking why he hasn't seen anything about "Buddy" (Individual C) being killed on the news.

f. According to the recording, YATES explained to CD-1 and SOI-1 that if he surveils the area where he believes Individual C hangs out, YATES could potentially identify Individual C.

g. According to the recording, YATES explained that the key to Individual D's underlying murder are the witnesses.

h. According to the recording, CD-1 asked YATES what a good price would be to offer Individual A on Facebook, alluding to Individual A potentially soliciting for prostitution on Facebook, and utilizing this as an opportunity to meet with Individual A. YATES replied, "seven to a stack". Agents understand this to mean that Individual A's rate would be $700 to $1,000 US currency. YATES proceeded to state, "where you at? Where you at?" Agents understood this to be YATES explaining how to message Individual A on Facebook to get her attention.

21

i. According to the recording, YATES explained that it doesn't matter who gets murdered first, but both Individual A and Individual C have to be murdered.

42. At approximately 10:52 p.m., YATES was observed exiting SOI-1's vehicle, entering YATES's vehicle, and departing the area.

**H. CONCLUSION**

43. Based on the foregoing, I respectfully submit that there is probable cause to believe that, between on or about July 5, 2024 through on or about July 30, 2024, CHRISTOPHER YATES used and caused another and conspired with others known and unknown to use and cause another to use a facility of interstate or foreign commerce, with the intent that a murder be committed as consideration for the receipt or, or as consideration for a promise or agreement to pay, anything of pecuniary value, and conspired to do so, in violation of Title 18, United States Code, Section 1958(a).

FURTHER AFFIANT SAYETH NOT.

*Ruben Garcia*

RUBEN GARCIA
Special Agent, Homeland Security Investigations

SWORN TO AND AFFIRMED by telephone on July 31, 2024.

*Heather K. McShain*

Honorable HEATHER K. MCSHAIN
United States Magistrate Judge