IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ) Case No. 24 CR 357-1
)
v. )
)
CHRISTOPHER YATES, ) Chicago, Illinois
) March 20, 2025
Defendant. ) 2:07 p.m.

TRANSCRIPT OF PROCEEDINGS - STATUS
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. EMILY VERMYLEN
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: LEONARD TRIAL LAWYERS, LLC
BY: MR. MATTHEW CHIVARI
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602

Also Present: MS. ANNA WORTH, Pretrial Services

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: The case before us this afternoon is Case No. 24 CV 357-1, USA versus Christopher Yates.

THE COURT: Good afternoon, everyone.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the government.

MS. VERMYLEN: Yes, Your Honor.

Good afternoon.

Emily Vermylen, V-e-r-m-y-l-e-n, on behalf of the United States.

THE COURT: All right. Good afternoon, Ms. Vermylen.

And defense counsel.

MR. CHIVARI: Good afternoon, Judge.

Matthew Chivari, C-h-i-v, as in "Victor," -a-r-i, on behalf of Mr. Yates, who is present in custody.

THE COURT: All right. Very good.

Good afternoon.

You just entered an appearance?

MR. CHIVARI: I did. I work with Mike Leonard, who has --

THE COURT: Yep.

MR. CHIVARI: -- also appeared on the case.

THE COURT: Of course.

I saw Mr. Leonard this morning.

Well, good afternoon to you.

And, Mr. Yates, good afternoon, sir.

THE DEFENDANT: Good afternoon, sir.

THE COURT: All right, folks. We are here for status.

I also got a copy of a recently filed motion for release from custody, which I'm happy to talk about.

Before we get there, why don't you just bring me up to speed, Ms. Vermylen, on where we are and where we're headed and how soon you want a trial date.

Go ahead.

MS. VERMYLEN: Yes, Your Honor. Thank you.

The bulk of discovery has been tendered in this case, Your Honor. I do expect that there will be a few additional reports that have not yet been written and generated that will need to be produced, but the bulk of discovery has been produced.

So I think where we are is that counsel is reviewing discovery, would like a hearing on their motion for release, and then after that, the parties were going to discuss next steps.

THE COURT: Okay. When you say some additional reports are going to go out the door, how soon are you going to do that? And what sort of volume are we looking at?

MS. VERMYLEN: Not a high volume, Your Honor. Less than a hundred pages.

I would say within the next month or so.

THE COURT: Mm-hmm. Okay.

How long is trial going to take?

MS. VERMYLEN: Your Honor, I believe about a week and a half.

THE COURT: Okay. When should we go?

MS. VERMYLEN: I have not spoken with counsel in terms of their estimate of the case and his schedule, so I -- I guess I would defer to counsel.

THE COURT: Yeah. Okay. Fair enough. Well, it's worth thinking about.

All right. Defense team, why don't you respond to that. Give me any update you want to give.

Go ahead.

MR. CHIVARI: Yes. I'll confirm the status of discovery, as was represented by Ms. Vermylen.

I think at this point, it's probably a little too early to say with certainty what trial would look like. I know our -- we have a firmer grasp of our schedule, but we can continue to confer and provide that information to the Court --

THE COURT: Yeah.

MR. CHIVARI: -- as well.

THE COURT: Yeah. Fair enough.

I know you've just entered an appearance. And Mr. Leonard, I think, entered an appearance a week ago -- or

maybe it was two weeks ago. It was pretty recently.

Do you folks have really any sense of the case at all at this point?

I wouldn't think so. I mean, you've got to get your arms around it.

MR. CHIVARI: Very initial, Your Honor, certainly based on our conversations with our client. We'll certainly expedite a review of discovery and any discovery that comes our way.

THE COURT: How voluminous is it?

And let me back up.

Do you have everything? Do you have everything that the predecessor counsel --

MR. CHIVARI: I believe we have what's been tendered. I'm -- not terribly voluminous. It's hard to -- hard to gauge.

THE COURT: Okay. And did you get that discovery from the government? Did they reproduce it to you, or did you get it from your predecessor counsel?

MR. CHIVARI: I believe we have it from the government. I'll have to confirm --

THE COURT: Okay.

MR. CHIVARI: -- our exact source, but I know we've received some.

THE COURT: Is that right, Ms. Vermylen?

MS. VERMYLEN: That's my understanding, Your Honor.

THE COURT: Okay. I just want to make sure the defense team has everything. That's all. So maybe you folks can work together cooperatively and just double-check that --

MS. VERMYLEN: Yes, Your Honor.

THE COURT: -- he's got everything.

All right. Okay. Anything else to say on discovery?

MS. VERMYLEN: Not from the government.

THE COURT: It sounds like by the end of April, if not before, you're going to have everything out the door and in defense team's hands, it sounds like.

MS. VERMYLEN: I believe so. And if we need more time, we'll certainly let counsel know -- and the Court -- as soon as possible.

THE COURT: Okay.

All right. So let me turn to the motion for release from custody. There was a motion filed on March 12th. I have a few reports from pretrial on that. I don't think anybody -- you are here from -- okay. Very good. I didn't see you over there.

Do you want to go ahead and introduce yourself?

THE PRETRIAL SERVICES OFFICER: Yes.

Good afternoon, Your Honor.

Anna Worth with pretrial services.

THE COURT: All right. Very good.

Thank you for being here, Ms. Worth. Pretrial always

does a terrific job. I didn't recognize you as the pretrial services officer over there, so my apologies. I wasn't slighting you over there.

THE PRETRIAL SERVICES OFFICER: Thank you, Judge.

THE COURT: Okay. So I don't know if the government wants to file a written response or if you want to just handle it now.

I've looked at the motion. You know, it's basically a page, which is perfectly fine. I've looked at the reports from pretrial. I looked at the initial report that was filed back in August of 2024. You know, so I've read all that.

But does the government want to file a written response, or do you just want to do it orally?

MS. VERMYLEN: Your Honor, I'm prepared to present a brief oral argument at this juncture.

THE COURT: Okay. Well, it's Mr. Yates's motion, so I'll hear from the defense team first, and then the government can say whatever it likes. And we'll hear from pretrial, and then we'll go from there.

So go ahead.

MR. CHIVARI: Yes, Judge.

Starting first with the pretrial services report, I think that articulates well the -- kind of the overarching factors that the Court would need to consider.

I think, wholistically, there is no legitimate risk of

danger to the community from Mr. Yates nor is there any credible risk of flight.

His ties to the community are numerous and, in this case, you know, very substantial. And I'll get into those in a moment.

Just touching on some of the factors that are specifically mentioned in the pretrial services report, the list of Mr. Yates' criminal history, I think, also corroborates that he does not pose a danger to the community.

His most recent cases are going on -- are about four years old. There is a notice of a failure to appear, but that is -- he was simply, you know, late for court on one occasion, and that was -- that warrant was quashed and that case ended up resolving in satisfactory termination of supervision.

So there's really no indication from his criminal history to suggest that he's a danger or a flight risk.

Turning to -- I think what he's done outside of that is more important for the Court to consider.

Mr. Yates is a 40-year-old husband, a father, and probably his most important role at the moment -- or at least the one that weighs on him the heaviest is his role as son to his mother.

He has a history of successful work with the military. He was in the Navy between October -- 2003 and 2011. He has eight years in the military and was honorably --

THE COURT: What did he do for the Navy?

MR. CHIVARI: -- discharged.

I'm sorry?

THE COURT: What did he do for the Navy?

THE DEFENDANT: Engineering, sir.

THE COURT: All right. Good job. Thanks for doing that.

MR. CHIVARI: After that, and most recently, he's worked with the U.S. Postal Service at their Oak Park location. He's had that job full time for over five years. And his work there has been nothing short of exemplary, to the extent that, even though he's in custody now, he still has that job available to him, should he be able, upon release to be able to continue working. A profoundly positive impact on the community, even just looking at his employment.

The -- of course, one of the biggest impacts on Mr. Yates right now is the condition of his mother, and that's, I think, summarized certainly in the pretrial services report.

So, you know, his mother is on hospice and, from a large overview perspective, is not doing well. That very reasonably and understandably draws Mr. Yates' attention.

And it's not just her health situation in the immediate future, but prior to his arrest, he helped run the household and helped his mother maintain that household, including paying rent, other bills, and really helping to

shoulder the burden and responsibilities of maintaining that household. And of course, that's increased recently given his mother's, you know, turn towards -- the serious nature of her health.

So that, of course, draws his attention.

He's also married and has been married for 20 years. He's the father of seven children. They have a son, 19, in the home now. And his, you know, children are doing well. Those children have been and continue to be a very important part of his responsibility.

So he has a -- numerous and ample ties to the community. And it's really not just a numbers issue, Judge. It's really -- when you look at the nature of those ties, there's no place he could or would go.

For that reason -- additionally, he's just simply -- there's no credible threat of flight. What he wants most in this moment is to be able to spend time with his mother and continue to help her shoulder those responsibilities in her -- the time that she has remaining, whatever time that that may be, and, if allowed to by the Court, to continue to work and maintain the very positive law-abiding and productive activities that he's been accustomed to and has demonstrated for a number of years.

So looking even at the pretrial services report, considering, without hiding from any aspect of his criminal

history and his conduct outside of that just wholistically, there really is -- there's no legitimate reason to see that Mr. Yates would be a threat to anybody in the community or, certainly, a flight risk.

If the Court found that there was any lingering concern in either of those two categories, they could certainly be ameliorated and mitigated by any number of conditions imposed upon release.

You know, Mr. Yates is certainly -- I think is an appropriate candidate for release on any conditions that would be set.

And based on that, we would ask that he be released on whatever conditions the Court would determine feasible.

THE COURT: Thank you.

What is Mr. Yates charged with?

MR. CHIVARI: He has three counts per the indictment. Racketeering with the intent that murder be committed as Count I and II, and then a transfer of firearm is related to Count III. So the 19 -- two counts of 1958(a).

THE COURT: Just put it in plain English. Just put it in plain English. What's he charged with?

MR. CHIVARI: Murder for hire and the gun charges, the 924(h).

THE COURT: Did he hire someone allegedly or was he allegedly hired to kill someone? Which --

MR. CHIVARI: Oh.

THE COURT: I'm not saying what actually happened. I'm saying, what is he charged with? Is he charged with --

MR. CHIVARI: Alleged to be -- to be hired. Of course, we --

THE COURT: To be hired? He was the person hired, allegedly?

MR. CHIVARI: Yeah.

THE COURT: Okay.

MR. CHIVARI: That's our understanding at this point. Of course, we --

THE COURT: Hired to do what?

MR. CHIVARI: Involved in allegedly hiring to -- to murder an individual. I mean, we --

THE COURT: Two people. Two people. Wasn't it two people? Individual --

MS. VERMYLEN: Yes, Your Honor, it is.

And, Your Honor, for the record, the complaint sets forth that he was -- that the defendant solicited another individual to commit a murder.

THE COURT: Okay. So -- and just to be a hundred percent clear, folks, we're in the land of allegations. We're not in the land of, you know, guilt.

MR. CHIVARI: Understood, Your Honor.

THE COURT: So, Mr. Yates, you've got to understand,

we're just talking about what you're charged with now. So don't think I'm getting ahead of myself, because I'm not.

Okay. But I do have -- I can consider the charges, can't I? Everybody agrees with that?

MR. CHIVARI: Yes, Judge, of course.

THE COURT: Okay. So -- so he's been charged with hiring someone else to hire someone else to kill two people.

Did I get that right?

MS. VERMYLEN: Yes.

THE COURT: Okay. Doesn't that sound like a threat to the community?

MR. CHIVARI: Judge --

THE COURT: It's the threat to a community.

MR. CHIVARI: I would -- when looking at the charge just on its face out of context, I would probably --

THE COURT: Not out of context. This is the context.

MR. CHIVARI: Understood, Judge.

THE COURT: This is the context. So if this charge isn't a threat to the community, what charge is?

MR. CHIVARI: We understand the nature of the charges. We certainly, you know, dispute the -- his involvement as it's alleged. Looking outside of what's alleged in the complaint, there is just no other past performance to suggest that there is any danger.

Again, even focusing on the seriousness of the charge

and the nature of the charge, I think any concern can be mitigated by any number of conditions.

THE COURT: Well, let me back up for a second.

There was an indictment, right? It's not just a complaint, Ms. Vermylen?

MS. VERMYLEN: That's correct, Your Honor.

THE COURT: So there was a probable cause finding by definition, right?

MS. VERMYLEN: Yes, Your Honor.

THE COURT: So the grand jury returned an indictment and found probable cause to believe that the defendant was involved in a plot to hire someone to kill someone.

Is that the nature of the allegation?

MR. CHIVARI: We understand that, Judge.

THE COURT: Yeah. So I don't understand the notion that there's no reason to think that he's a threat to the community, because by definition, just the nature of the charges and the nature of the finding by the grand jury, there is a reason, because he's been charged with something pretty serious.

But what am I missing?

MR. CHIVARI: And I don't dispute that -- that interpretation, Judge. I'm simply asking the Court to widen their gaze in terms of these other factors.

And on balance, I don't believe there's a risk. Of

course, the seriousness of those charges notwithstanding, any concern related -- if it is tied to the charges, can be mitigated with appropriate conditions.

THE COURT: Well, how about that? I mean, if he's been charged with being involved in a plot to hire someone -- hired to kill someone, you know, how is home monitoring going to protect the community?

It's, you know -- you're not locked in your home. You could just leave and hurt somebody, hypothetically speaking. I have no reason to think Mr. Yates would do that, but that is within the realm of possibility. Right?

I mean, if somebody's home, they're not locked in their home; they could go out the door and hurt somebody, hypothetically.

Go ahead.

MR. CHIVARI: Understood, Your Honor. And I think that there could be -- you know, electronic monitoring is one possible --

THE COURT: Yeah.

MR. CHIVARI: -- condition. And I'm not suggesting that that alone --

THE COURT: But even that, that doesn't restrain someone; it just notifies pretrial if they leave. Right?

MR. CHIVARI: Understood.

THE COURT: Right. Okay.

Here's something I didn't understand about the motion: It proposes that his mom be the custodian,and simultaneously says he needs to be home to take care of his mom because she's in hospice.

I don't understand how somebody in hospice could be an appropriate custodian. Like, those two facts don't play well together.

On the one hand, you say he needs to be there to take care of mom, and on the other hand, you say mom is going to be the one to make sure that he complies.

So how do those two facts play well together?

MR. CHIVARI: I think that's a reasonable point of consideration, Judge.

Mr. Yates' mother is -- again, he has prior to his arrest, and if granted release -- you know, would certainly, you know, work to help provide for her. She's certainly -- while, you know, she's not traveling out, is, you know, coherent and communicative and certainly involved and independent to the greatest degree possible, and I think in that way could certainly function as a third-party custodian in many ways.

THE COURT: Mr. Yates, I'll say, sir, I hope your mom's okay. I've been there. I've dont that. I know what that feels like.

THE DEFENDANT: Yes, sir.

THE COURT: So I hope your mom is okay, because I know exactly what that feels like.

Okay. Let me hear from the government.

Go ahead.

MS. VERMYLEN: Thank you, Your Honor.

This defendant poses a danger to the community and should remain detained.

Turning first to the nature and circumstances of the offense, the charges here are extremely serious, as Your Honor noted.

As set forth in the complaint, the defendant reached out to an individual -- I'll call him Individual A -- and stated that he was looking to potentially solicit a murder for hire.

The defendant then met with Individual A and another individual I'll call Individual B. The defendant gave Individual B a firearm, $250 in cash, and solicited Individual B to murder two people.

At that meeting, he did not fully identify those people. They were to be witnesses in a trial in state court where the defendant in that trial was charged with murder.

Over the course of the next few weeks, the defendant had phone calls, texts, and in-person encounters with Individual A. And the defendant said he was gathering identifiable information regarding the two intended victims.

The defendant then had another meeting with Individual A and Individual B where he actually provided identifying information about one of the victims and provided logistical information about how Individual A and Individual B could encounter that intended victim.

The defendant was arrested shortly thereafter.

So, Your Honor, these were not just idle threats that the defendant made, because he carried through -- he took -- he took actions consistent with -- with his stated intention of committing a murder for hire. He gave a firearm and cash to Individual B. He also provided identifying information about one of the targets.

Your Honor, the weight of the evidence here is also strong because there are recordings of these meetings between the defendant and Individual A and Individual B. There are also recorded calls and text messages.

Turning to the characteristics of the defendant, as set forth in the pretrial services report, he has several misdemeanor convictions, including soliciting unlawful business, driving on a suspended license, carrying and possessing a firearm, which is, again, another instance in which the defendant was -- or was caught with a firearm.

He also has a misdemeanor possession of cannabis conviction. He has a history of failure to appear in those cases, a history of noncompliance with probation, a conditional

discharge.

Your Honor, as far as the proposed third-party custodian, I don't believe that individual is here in court, so the government is not able to question that individual to further establish her suitability. But just based on the pretrial services report, as Your Honor noted, she appears to be limited in her ability to supervise because she's on hospice care and she's ill.

So, Your Honor, in summary, this defendant poses a danger to the community and should remain detained.

THE COURT: All right. Thank you, Ms. Vermylen.

I will say this about his criminal history: He does have a number of prior convictions. I do think it is fair to say that some of them are misdemeanors. And he's got, I think, only two convictions in the last, you know, dozen years or so. One of them was a misdemeanor for cannabis and a speeding-related violation. I'm not going to throw any stones at a speeding-related violation. But there -- I guess there was a hire -- a firearm-related offense in 2021.

Do we know anything about the facts of that case by chance?

MS. VERMYLEN: I do not, Your Honor.

THE COURT: Okay. And then I noticed from the report that there was a failure to appear in 2023 on one charge, and there was a violation of probation in another case in 2024.

Do we have any background on that?

I assume we don't, but --

MS. VERMYLEN: I do not.

THE COURT: Okay. And then there was a battery conviction from 2007. I assume we don't have any information on that. It was a misdemeanor. And it could be a variety of things. He was a young man. It was a long time ago.

MS. VERMYLEN: Unfortunately, I don't, Your Honor.

THE COURT: Okay. That's helpful. Thank you.

I want to hear from pretrial.

Any additional services -- I'm sorry -- any additional information pretrial services can provide?

Go ahead.

THE PRETRIAL SERVICES OFFICER: Nothing new from the report, Your Honor, just we continue to recommend detention based on the risk of danger to the community and the fact that he was on probation for the misdemeanor firearms offense when this occurred, allegedly.

THE COURT: All right. So, in other words, you're saying the conduct in question here, meaning the case in front of me, took place when he was on probation for the 2021 case?

THE PRETRIAL SERVICES OFFICER: Yes, for the 2021 misdemeanor firearm case, Case No. 22 CR 0059801.

THE COURT: Yep, I see that. I'm just doing a little math. He got two years of probation, I see, starting in April

of 2023.

I've got it. Okay. I've got the math now.

All right. All right. Thank you for that.

Defense team, do you want to respond to anything you've heard?

MR. CHIVARI: Just briefly, Your Honor.

I think the -- you know, his criminal history, especially the recent, demonstrates a respect for the Court. There is a -- the single failure to appear that I see on the latest, the 11/10/2021 case, again, that was -- the petition to revoke was -- the warrant that was issued was quashed, and he terminated supervision satisfactorily.

So, I mean, even in spite of those misdemeanor charges, there is a history of him complying with those conditions over several years to result in a satisfactory termination. So that, I think, also lends itself towards Mr. Yates's ability to comply with any conditions for release.

And I think our argument, again, would be that any lingering concern regarding either the nature of the case or the charges or any -- any concern related to his past criminal history, which I really think that there is none, to suspect that he's certainly a danger or a flight risk, those can be mitigated easily by any number of conditions that could be imposed upon release.

THE COURT: Could you talk about the strength of the

evidence?

The government says they've got him on recordings, and they've got him on text messages. I don't know --

MR. CHIVARI: Without --

THE COURT: I have not seen them. I have not heard them, so I don't know.

But is that correct?

MR. CHIVARI: We disagree with the overall assessment. Like, there are such recordings of conversations, but I think it is the -- what is not reflected in that summary or readily apparent in just the existence of recordings is the conversations that took place before those recorded conversations.

And so for that reason very generally -- and I'm being careful not to speak too directly -- but I think the -- the inference of guilt or the probable cause related to the charges based on these is superficial and there is more interaction, more communication between the individuals mentioned that we would hope to address at trial that would certainly change the calculus and the trier of fact's consideration as to Mr. Yates' guilt.

So for that reason, I would, respectfully, contest and disagree with the government's assessment that -- the evidence is certainly voluminous, but we would strongly disagree in that it points to -- points to guilt.

THE COURT: Can you respond to the government's point about who the alleged victims were going to be?

I mean, this case is not simply a murder-for-hire case. This is a case about an allegation that the defendant was hiring someone to kill a witness in a case. So not just a person, but a witness in a murder case. So it's a murder of a witness. So it seems to really up the ante in terms of seriousness and gives me substantial pause.

Go ahead.

MR. CHIVARI: Yes. Your Honor, can I just have a moment?

THE COURT: Yeah, of course.

(Counsel and defendant conferring.)

MR. CHIVARI: Your Honor, what I would say in relation to that is the -- I think the conversations that took place were -- were instigated by individuals that I think -- and this -- we have a good-faith reason to believe that this would come out, certainly, at trial -- had a number of motivations to, one, lie or, two, I think create circumstances that would -- that did result in Mr. Yates's, you know, liability or the appearance of culpability in this case.

So I think for those factors, the broad takeaway is that there are facts deeper than the surface than we have represented that may bear out in discovery that we have once we complete our review, but -- perhaps even additional

investigation. But I think there's a greater -- more details to the story that have not surfaced that will bear directly on Mr. Yates's involvement, the nature of involv- -- his involvement that I think -- again, the charges on their face are serious, but Mr. Yates's involvement and how he came to interact with these individuals is not reflected here or those details are not presented to the Court at this point.

And we don't have all of those details, but enough to suggest that there's more to it than the inferences that would be otherwise reasonable, just assuming these superficial facts at their face.

So I think the takeaway from all of that is that I don't think the presumption is great based on the evidence that we have in discovery at this point. And, again, even if there is a lingering concern about Mr. Yates being a danger to the community, that can be mitigated with conditions.

But to the Court's direct question, I think there's more -- more to it that -- than is being portrayed or revealed to the Court at this point.

THE COURT: Okay. Is there anything else anyone would like to say? Anyone?

MS. VERMYLEN: Not from the government, Your Honor.

THE COURT: Anything else from pretrial?

THE PRETRIAL SERVICES OFFICER: No, Judge. Thank you.

THE COURT: After consulting with your client, is

there anything else you want to add?

MR. CHIVARI: No, I just want to point out that we have some family members in the gallery that have interaction with Mr. Yates's mother as well as him. And if there's any -- also, to address the Court's concern about the appropriateness of Mr. Yates's mother as a third-party custodian, there are others that we could tender to the Court and pretrial services to vet as potential alternatives.

THE COURT: Okay.

All right. Well, thank you, folks. I appreciate everybody talking through the motion.

I have read all the papers. I've read the helpful reports from pretrial.

Pretrial always does a terrific job. I appreciate all the hard work you folks put into everything.

So the motion for release from custody is going to be denied. I'm going to rely primarily on the fact that Mr. Yates poses a danger to the community.

Let me say off the bat here that Mr. Yates is charged with a crime. Nothing has been proved yet. He's got the presumption of innocence. Certainly he's going to get it in my courtroom. You know, he's innocent until proven guilty, and nothing has been proven yet. All right?

So, Mr. Yates, you've the presumption of innocence, but I do have to make the best decision I can based on what

I've got in the meantime. Okay?

And I have a defendant in front of me who has been charged with a murder-for-hire plot. The charges are about as serious as they come. The allegation is that Mr. Yates was involved in a situation where other people would murder two people. That's bad enough, but these people were alleged to be witnesses in another case, witnesses in a murder case.

You know, it's hard to think of a case that would involve a greater threat to the community than a case that involves an alleged plot to murder witnesses in a trial.

So I have to look at the nature and circumstances of the alleged offense. And when I look at that factor, that's a very strong reason to continue Mr. Yates in custody.

I've also heard what the government said about the strength of the evidence. This is not a situation where there's just one witness who said he's heard something. This is a case that apparently involves recordings and text messages.

I've heard what defense counsel said on that. Maybe there is a good explanation. Maybe when all the evidence comes out, the jury will find that there was some other reason for what was said. I don't know. I mean, you're keeping your powder dry on what your defenses are going to be.

But I do take the government at its word that there are text messages and there are recordings out there. The

existence of those recordings and text messages solidify the notion that there is a strong evidentiary basis for the charge.

I also have to look at his criminal history. This is not the most lengthy and most serious list of offenses I've ever seen. We've got about six or eight offenses, give or take, here. A number of them are misdemeanors. A number of them are older. So I think those are good points that defense counsel raised.

But one in particular does give me pause. There was a charge for a weapon. It was pled down. This is in 2023. It was pled down to being a possession of a firearm. So it was only a misdemeanor, but it is a firearm offense. And I'm troubled by the fact that the alleged offense here, meaning the case in front of me, took place while he was on probation. I think that is an aggravating factor that I have to consider.

There are, again, other offenses in his history, including battery, that gives me pause, but, you know, it was 15 years or so ago, give or take. So it doesn't weigh a lot, but it does tell me something.

I also find that his mother is not an appropriate custodian. The defendant wants to get out of custody so that he can take care of his mom. I understand that. That is a worthwhile thing to want to do. But on the flip side, if he has to take care of his mom, I don't think his mom is in a great position to make sure that the defendant plays it

straight and doesn't violate the terms of any conditions that I may impose. So I don't think his mom is healthy enough and strong enough, unfortunately, to be a third-party custodian.

I also don't think that there's any restrictions that I could put on the defendant that would keep the community safe. I don't think electronic monitoring would do it. I don't think home detention would do it.

He is charged with a plot to facilitate the murder of two people, and those two people were witnesses in a murder case in state court. Putting him on electronic monitoring is not going to keep him from doing something that might be dangerous to other people.

So I have a lot of concerns about the need for public safety.

I have considered the fact that he did violate probation once. It does seem to be relatively minor, so I've considered it, but it doesn't weigh -- I don't weigh that factor particularly heavy.

So in sum, when I look at the nature and circumstances of the alleged offense, it weighs very strongly in favor of detention.

So that's my ruling. Okay? So that's the ruling.

And let me say again to you, Mr. Yates, two things: I hope your mom is okay, and I want to underscore that you've got the presumption of innocence here, nothing has been proven, but

I just need to make the best decision I can based on the record that I've got at this stage of the proceeding.

So he is going to need to be detained pending trial. Okay?

When do you folks want to come back?

MS. VERMYLEN: Your Honor, would 45 days be acceptable?

THE COURT: Yeah, I think that's fine.

Defense team, is that okay with you?

MR. CHIVARI: That sounds reasonable, Judge.

THE COURT: All right. So why don't we find a date, maybe in the first week of May, for them.

Thank you to Kerwin for stepping up for me today.

MR. CHIVARI: Your Honor, if I could propose an afternoon appearance on Tuesday, May 6th.

THE CLERK: You're good for that day.

MS. VERMYLEN: That works for the government. Thank you, Your Honor.

THE COURT: All right. We'll do it 5/6, May 6th.

THE CLERK: At 2:00 o'clock.

THE COURT: Yeah, let's do 2:00 o'clock.

Does that work for everybody? How's that, May 6th, everybody, 2:00 o'clock?

MR. CHIVARI: Yes, Judge.

MS. VERMYLEN: Yes. Thank you.

THE COURT: All right. And here's the plan: I'd like to confirm that the government has completed its discovery production by then.

MS. VERMYLEN: Yes, Your Honor.

THE COURT: Make sure everything has been done.

And I want you to please confirm that you've gotten everything by way of discovery. And I want to talk at that point about trial. I want to know when you can be ready, when you want to go, and how much time you need.

MR. CHIVARI: Understood, Judge.

THE COURT: It has come to my attention that we are the slowest district in the country, last place, for the speed of trials in terms of how long cases get to trial.

There's a lot of reasons for that. I think it's part of the culture here in Chicago. I'm going to try to be a little bit more counterculture, I think, and try to speed things along.

All right. So come in May to figure out a trial date. We're just going to book it. Okay. We're going to get you on the calendar.

So just talk it over cooperatively. Let me know how much time you need and when you can go, and we'll figure it out. We'll get you a trial date. Okay?

MR. CHIVARI: Thank you, Judge.

THE COURT: Anything else from the government today?

MS. VERMYLEN: Yes, Your Honor. The government moves to exclude time up through and including May 6th in the interest of justice to allow the parties to produce and review discovery and to prepare for trial.

THE COURT: Okay.

(Counsel and defendant conferring.)

MR. CHIVARI: No objection to the exclusion of time, Your Honor.

THE COURT: Okay. I will exclude time in the interest of justice between now and May 6th to allow the parties time to complete and review discovery, consider pretrial motions, prepare for trial. So I'll exclude time in the interest of justice, okay --

MS. VERMYLEN: Thank you, Your Honor.

THE COURT: -- between now and the next date on May 6th.

Anything else from the government this morning?

MS. VERMYLEN: No, Your Honor.

THE COURT: All right. Anything else from the defense team?

MR. CHIVARI: No, Judge. Thank you.

THE COURT: All right. Final word: Thank you to the deputies who are kind enough to be here today. You folks are the best people in the building, the best people in the business. I appreciate you folks. Thank you for being here.

We'll look forward to seeing you on May 6th.

Thank you, everybody.

We're adjourned.

MS. VERMYLEN: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 2:46 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* ___________ *4/15/2025* _______
Amy M. Kleynhans, CSR, RPR, CRR Date
Official Court Reporter